[Cite as *In re C/W Children*, 2026-Ohio-138.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: C/W CHILDREN.      :      APPEAL NO.   C-240553
                          :      TRIAL NO.    F/18/53 Z

                          :

                          :

                          :            *JUDGMENT ENTRY*

                          :

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 1/16/2026 per order of the court.**

**By:**_____
       **Administrative Judge**

**[Cite as *In re C/W Children*, 2026-Ohio-138.]**

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: C/W CHILDREN. | : | APPEAL NO. | C-240553 |
| | | TRIAL NO. | F/18/53 Z |
| | : | | |
| | : | | |
| | : | *O P I N I O N* | |
| | : | | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: January 16, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Marin Confrancesco,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Kacy C. Eaves*, Guardian Ad Litem for the minor children,

*Woloshin Law Offices* and *Michael Woloshin,* for Appellant Mother,

*Alana Van Gundy*, for Appellee Father M.J.,

*Jon R. Sinclair*, for Appellee Father C.H.,

*Kimberly Varney Thomas,* for Appellee Father R.W.

**KINSLEY, Presiding Judge.**

**{¶1}** In this appeal filed by Mother, we consider whether the judgment of the Hamilton County Juvenile Court adjudicating two of her children to be neglected and six of her children to be dependent was supported by clear and convincing evidence. For reasons we explain in this opinion, we hold that it was not. We accordingly sustain Mother's assignment of error challenging the juvenile court's adjudication and reverse its judgment finding the children to be neglected and dependent and placing them in the temporary and legal custody of the Hamilton County Department of Job and Family Services ("HCJFS") and their respective fathers.

### *The Facts*

**{¶2}** This appeal involves Mother and six of her seven children: (1) S.W., who was 14 years old at the time of the juvenile court's adjudication; (2) Sa.C.[1], who was 12 years old at the time of the juvenile court's adjudication; (3) Sr.C., Sa.C.'s twin, who was also 12 years old at the time of the juvenile court's adjudication; (4) O.M.C., who was ten years old at the time of the juvenile court's adjudication; (5) Baby Boy A, who was one year old at the time of the juvenile court's adjudication; and (6) Baby Girl B, Baby Boy A's twin, who was also one year old at the time of the juvenile court's adjudication.[2] Also parties to this appeal are R.W., the father of S.W.; C.H., the father of Sa.C. and Sr.C.; and M.J., the father of A and B. The essential facts of the case unfolded in January and February of 2023 and are largely not in dispute.

**{¶3}** At the time this case began, Mother lived with her six children in a home

---

[1] Sa.C. and Sr.C. have similar first names. Sa.'s name begins with "S" and ends with "A." Sr.'s name begins with "S" and ends with "R."

[2] The babies had not been given more formal names at the time the case was initiated, so the complaints and court orders refer to them as Baby Boy A and Baby Girl B. Various documents in the record, however, suggest that Baby Boy A has now been named O.J., and Baby Girl B has now been named L.J. But, as Mother testified in court below, A and B can themselves be names, and we refer to the infants using those names in this opinion.

she owned, and her school-aged children were enrolled in the local public school system. Mother adopted a natural and holistic lifestyle. Consistent with her Islamic faith, she avoided pork, vaccinations, and the excessive use of medications like Tylenol and cough syrup. She practiced meditation and taught yoga. After years of education, she worked as a certified paramedic and EMT with a local fire department and was trained in recognizing the signs of dehydration in adults and infants.[3]

{¶4} Mother gave birth to twins, A and B, on January 21, 2023. They were both quite large, considering that Mother carried them simultaneously. According to hospital records and subsequent testimony from medical witnesses, A weighed 3.205 kg or 7 pounds 1 ounce, and B weighed 3.09 kg or 6 pounds 13 ounces.[4] M.J. was not present at the babies' birth because he missed the phone call that Mother was in labor, although he did see the twins after they were born.

{¶5} Mother scheduled an appointment at Cincinnati Children's Hospital Medical Center ("CCHMC") for the babies to be seen by a pediatrician on January 25, 2023, but she cancelled that appointment after she took them to Good Samaritan Hospital ("Good Sam") the day before. She suspected that B had developed jaundice, so she sought out medical care for her. On January 24, 2023, at Mother's initiation, both babies were seen and weighed at Good Sam and determined to be in good health; it turned out that her fear about jaundice was a false alarm.

{¶6} Mother and M.J. then brought the twins to CCHMC on January 31,

---

[3] We have no reason to believe that Mother's employment status has changed as of the time of this opinion.

[4] These birthweights were taken on a scale at Good Samaritan Hospital where the babies were born. Throughout this opinion, we cite different weights taken by different providers using different scales. The unequivocal expert testimony in this case indicates that scales may be differently calibrated, such that measurements taken on one scale are not entirely comparable to measurements taken on another scale. We reference these metrics with this possible variation in mind.

2023, for a ten-day old, well-child visit to establish pediatric care. At that visit, the babies were seen by Dr. Carrie McIntyre. Dr. McIntyre weighed the babies and determined that they had lost a significant amount of weight from their birthweight: 2.685 kg for A, representing a loss of 16 percent of his body weight, and 2.66 kg for B, representing a loss of 14 percent of her body weight. Based on these measurements, Dr. McIntyre recommended that the babies be admitted to the hospital for observation. The babies' medical records indicated a suspected diagnosis of "possible failure to thrive," although Dr. McIntyre did not actually diagnose them with that condition.

{¶7} Mother and M.J. declined the recommendation to admit the babies to the hospital. They did, however, meet with a social worker at CCHMC, who provided an option to return to the hospital on February 3, 2023, four days later, for a weight check. The social worker also explained that she would be making a referral to 241-KIDS, a child-welfare hotline operated by HCJFS. According to hospital records, M.J. indicated that he understood.

{¶8} Later that evening, an HCJFS worker from the after-hours Present Danger Unit, Angel Bell, contacted Mother at her home. Bell relayed HCJFS's concern about the babies' conditions and asked Mother to take them to a medical provider for a weight check.[5] Mother then contacted nurse practitioner Caroletta James at the ECO Health Care Center ("ECO clinic"). James was the director of the ECO clinic and had been a practicing nurse practitioner for approximately nine years. She previously worked as a registered nurse for 14 years and had earned a Master of Science in Family Nurse Practitioner. James agreed to open the clinic late that evening to examine the

---

[5] The record does not explain why HCJFS required Mother to obtain another weight check on the evening of January 31st, when the babies had been weighed earlier that day at CCHMC.

twins.

{¶9} Bell accompanied Mother to the ECO clinic, where James weighed the babies. She found that A weighed 5 pounds 13 ounces, and B weighed 6 pounds 1 ounce.[6] She noted no signs of dehydration in either baby. After observing Mother breastfeed the babies, James counseled Mother on feeding strategies, recommended a lactation consultant, and advised Mother to return in one week so the babies could be rechecked.[7]

{¶10} Notably, Bell provided James with the babies' birthweights so that she could assess the decline in their current weights. Even with those numbers, James did not recommend hospitalization.

{¶11} Mother also permitted Bell to observe her home on the evening of January 31, 2023, after the ECO clinic appointment. Although Mother was a single parent raising six children and had given birth to twins ten days earlier, Bell found Mother's home in good condition. Bell saw several of the older children, and she noted the presence of food and supplies. She expressed no concerns about the children's home environment.

{¶12} At that point, Mother believed HCJFS's investigation was closed. Nevertheless, on February 2, 2023, Mother contacted a lactation consultant, Wendy McHale, for assistance in breastfeeding the twins. The parties stipulated that McHale was a lactation expert, as she held an international board certification in lactation

---

[6] All of the weights in the medical records submitted to the juvenile court were recorded in pounds and ounces except for the weights measured by CCHMC. On one occasion, an attorney attempted to suggest to a witness that grams are more precise than ounces. We reject that contention. Both are units of measurement capable of being measured precisely or imprecisely and are capable of simple mathematical conversion.

[7] Bell may have believed that this meant Mother would return on February 7th—exactly one week later—as she appears to have documented that date in her notes. But, according to ECO's records, Mother never had a follow-up appointment with the clinic scheduled for February 7th. She had an appointment scheduled for February 9th.

consulting, the highest level of certification available in the field of clinical lactation support. She received training from the Academy of Breastfeeding Medicine, an organization whose membership consists entirely of medical doctors.

**{¶13}** McHale first visited Mother's home on the morning of February 3rd, a Friday, and spent approximately three hours there. Upon arrival, she checked the babies for signs of dehydration. While B had none, A had a slightly sunken fontanel and a small patch of reduced skin turgor, or tightness, on one of his legs. McHale did not believe this was severe enough to warrant hospitalization, given that A did not otherwise show signs of distress.

**{¶14}** McHale then began her lactation process, which involved weighing the babies on a specialized scale prior to feeding and then weighing them again immediately thereafter to assess the amount of milk the babies consumed. McHale initially weighed A at 5 pounds 13 ounces and B at 5 pounds 14.9 ounces. She then observed Mother feed both babies, making some adjustments to A's positioning. From her outward observation, both babies appeared to successfully latch onto Mother's breast. But after the first feeding session, each baby weighed only .2 ounces more than their initial weight, which was less than she would have expected. According to McHale, young babies should gain about one ounce per day on average, with some days of potentially no or low gain followed by spurts of growth.

**{¶15}** McHale then inspected the babies' sucking skills and determined that A had a disorganized sucking pattern. She suggested that Mother attempt to cup feed breastmilk to the babies rather than feeding them from her breast directly. McHale and Mother worked on the cup feeding method together, and each baby drank approximately 1.5 ounces of Mother's milk. McHale made a plan to return to Mother's home the following Monday, February 6th.

**{¶16}** Later that evening, Mother received a call from James. James had been contacted by Madison East, a supervisor in the HCJFS Assessment Unit and Bell's direct supervisor. In court, East did not describe her educational background, training, or credentials, although she did indicate that she lacked any medical qualifications that would enable her to express opinions about the babies' treatment. James informed Mother that, based on her call with East, HCJFS was still investigating the babies' status. Surprised to hear that, Mother advised James that she had worked with McHale that morning and that the babies were making progress.

**{¶17}** According to James, East was overly aggressive to both her and her receptionist. East demanded that James call Mother and have her bring the babies in immediately for an examination. James told East that medical practices do not work that way–by following orders from HCJFS caseworkers—and that she would attempt to find some availability for a new appointment. East then threatened that she would tell the court that James did not have accurate birthweights for the babies if James did not do what she said. East followed through on her threat at a later court hearing, even though the clinic's records contained accurate birthweights for both infants—which James had obtained from Bell, whom East supervised.

**{¶18}** Also on February 3rd, Mother was contacted by Alisha Jordan, an HCJFS caseworker in the Assessment Unit who was supervised by East. Jordan requested a home visit with Mother's older children. Mother questioned why this was necessary when Bell had already attended an ECO clinic appointment with her and had already visited her home. In response, Jordan told Mother that the Present Danger Unit and the Assessment Unit are different divisions within HCJFS and that

8

the Present Danger Unit cannot close an investigation.[8]  With Mother's consent, Jordan scheduled a FaceTime call with the older children for February 9th.

{¶19}  McHale and James also spoke on February 3rd when McHale contacted James to share an update on the twins.  At that point, McHale learned about HCJFS's involvement from James.  At James's suggestion, McHale contacted East.  Like James, McHale also described East as combative, angry, and very upset.  East instructed McHale to convince Mother to take the babies to the emergency room immediately. But because McHale had just seen the babies for several hours that morning and knew that was not necessary, she asked East if she could share an update on her visit instead. Doing so calmed East down.  Together they planned that, in lieu of hospitalizing the babies, McHale would return to Mother's home on Saturday, February 4th, rather than delaying the appointment until the following Monday.

{¶20}  McHale then went back to Mother's house on February 4th and again on February 6th.  At the visit on February 4th, A's skin turgor and sunken fontanel had resolved, and she noticed no markers of dehydration in either baby.  Both of the infants had gained significant weight.  A weighed 5 pounds 15 ounces, and B weighed 5 pounds 15.5 ounces.  McHale felt that the babies were on the right track in terms of gaining back the weight they had lost, and at this point any concern she had about the babies' wellbeing had resolved.  She left a long voicemail update to this effect for East, who did not work on the weekends.

{¶21}  McHale's visit on February 6th was similarly positive, although more so for A.  At that visit, A's weight had gone up to 6 pounds 1.2 ounces, but B's weight had

---

[8] Between Bell, East, and Jordan, three different caseworkers worked on Mother's case on behalf of HCJFS in a matter of four days.  During that time period, Mother fielded what was at times inconsistent communication from individuals representing the agency.  For example, Bell explained that the Present Danger Unit is separate from the Assessment Unit.  But we question how a parent interacting with the agency would know or understand that.

slightly plateaued at 5 pounds 15.6 ounces. Mother explained that A had exhibited more cues of hunger the day before, so she had provided additional ounces of milk to him. They discussed evening out the milk supply for the babies moving forward. McHale planned to return to Mother's home on February 10th. After each visit, McHale reported the twins' progress to James and East. At that point, both babies had gained weight on consecutive visits and had gained significant weight since the January 31st CCHMC visit.

{¶22} The next set of relevant events occurred on February 9th. Records from the ECO clinic reflect that Mother scheduled a follow-up appointment for that day, but missed the appointment because she was running late. She later explained in court that James's clinic is approximately 40 minutes from her house and that she had pulled over to feed the babies while en route. The appointment was rescheduled for February 10th, the same day she was also scheduled to meet with McHale again.

{¶23} On February 9th, Jordan had the scheduled FaceTime call with S.W., Sa.C., Sr.C., and O.M.C., the four older children. The record contains no indication that Jordan provided instructions to either Mother or the children as to how the call was to be conducted. But Jordan was concerned that when she spoke to the children, they appeared to be looking to the side, possibly at another person, when they answered questions. From this behavior, Jordan concluded that they may have been coached by Mother during the call. In court, however, she agreed that the children had never spoken with her before and may have felt uncomfortable.

{¶24} After the FaceTime call piqued Jordan's concerns, and after Mother missed the February 9th appointment at the ECO clinic, East sought ex parte emergency custody of S.W., Sa.C., Sr.C., O.M.C., A, and B on behalf of HCJFS. At the ex parte hearing, East testified that James "did not have the true data of [the babies']

weights," although this was inaccurate; Bell herself, an HCJFS employee, had provided the babies' birthweights to James. East also testified that James's recommendation for the babies did not align with a recommendation from a different nurse practitioner that HCJFS employed to review the twins' CCHMC records. But East did not explain the background, credentials, or experience of HCJFS's consulting nurse practitioner, nor did she offer any evidence as to why this professional opinion would have been superior to James's. With regard to the older children, East was concerned that Mother had denied access to them, despite Jordan's FaceTime call.

**{¶25}** On February 9, 2023, the magistrate granted HCJFS's motion for emergency custody of A and B, but not of Mother's older children.[9] Jordan then contacted Mother and asked her to bring the twins to CCHMC for admission. Mother later met East and Jordan at CCHMC with the babies. She testified in court that she made arrangements with R.W., S.W.'s father, for the older children to stay with him while she accompanied A and B to the hospital. No evidence contradicted this assertion.

**{¶26}** CCHMC did not immediately offer formula or supplemental nutrition to A and B. Rather, Mother was permitted to continue breastfeeding at the hospital as she had done at home.

**{¶27}** East then informed Mother that she had sought court orders related to her older four children in addition to her babies. As a result, Mother became, in her own words, sad, overwhelmed, and stressed, and she contacted the suicide hotline for

---

[9] HCJFS did not file a written motion for emergency custody. Rather, the magistrate granted emergency custody following an ex parte telephone hearing that was initiated at East's request and at which East was the sole witness. The transcript of the recorded ex parte telephone hearing was not prepared until the filing of this appeal. Thus, given the absence of both a written filing supporting HCJFS's motion for emergency custody and a transcript, neither Mother nor any other party besides HCJFS had notice as to the basis for HCJFS's emergency custody request until this appeal was filed.

help in working through her emotions. Hospital records produced after the fact indicate that Mother said she thought about shooting herself but would never follow through on account of her children. When asked by the hotline worker if she had access to a firearm, she indicated that one was locked in the glovebox of her car in the CCHMC parking lot.[10]

{¶28} After speaking with the hotline, Mother felt better. She then returned to her car to obtain her breast pump and other feeding supplies, notably leaving her gun undisturbed. She came back to the hospital and began breastfeeding her children, but as she was doing so, the police arrived and arrested her. They transported her to the Psychiatric Emergency Services unit at the University of Cincinnati Hospital ("PES") for further evaluation. The gun remained secured in her vehicle the entire time, and there is no evidence that Mother ever accessed the weapon.

{¶29} Mother arrived at PES at approximately 2:01 a.m. on February 10th. At 4:00 a.m., she began asking for a breast pump, and at 5:00 a.m., she asked to see the doctor right away based on a "special circumstance"—she was scheduled to attend court that morning on HCJFS's complaint for temporary custody.

{¶30} Mother was eventually evaluated and discharged. The psychiatric social worker who conducted Mother's evaluation determined that she was suffering from an adjustment disorder caused by HCJFS's custody complaint rather than any clinical mental-health concern. The evaluation concluded that Mother had appropriate insight into her situation, that she did not present any safety concern to herself or others, and that she was willing to surrender her gun to the police as part of a safety plan.

---

[10] Mother had a permit to carry a concealed weapon.

**{¶31}** Mother left PES the afternoon of February 10th. She tried to contact CCHMC to inquire about A's and B's wellbeing, but CCHMC reportedly blocked her phone number. Hospital records indicate that the babies received formula by bottle after Mother was sent to PES and that they were discharged from CCHMC on February 10th. Mother, A, and B each spent less than 24 hours in the hospital.

**{¶32}** With regard to the older children, Jordan and East attempted to determine if anyone was present at Mother's home either before Mother brought the babies to CCHMC or while Mother was at PES. They did not see anyone there. On this basis alone, and without so much as asking Mother if she had made arrangements for S.W., Sa.C., Sr.C., and O.M.C. while she was in the hospital, they concluded that the older children were unaccounted for.

### The Court Proceedings

### A. Initial Complaint

**{¶33}** On February 10, 2023, HCJFS filed a complaint for temporary custody, signed by East, requesting that all six children be found abused, neglected, and dependent. The basis of the abuse and neglect allegations was Mother's inattention to A's and B's decline in birthweight. The basis of the dependency allegation was Mother's suicide-hotline call and hospitalization in PES. East admitted in court she had not reviewed Mother's PES records prior to HCJFS filing the complaint.

**{¶34}** Accompanying HCJFS's complaint was a motion for interim custody, alleging that the children were in immediate danger and needed to be removed from Mother's care. The motion was supported by an affidavit signed by East that relayed incomplete factual information to the court. In her affidavit, East reported the twins' birthweights and the weights taken by CCHMC on January 31st. She also referenced Mother's visit to the ECO clinic. But she did not relay that Mother had retained a

lactation consultant who had seen the babies three times after the CCHMC visit, nor did she report that the babies had gained a significant amount of weight after January 31st.[11] Her failure to provide this information to the court left the court with a more dire view of A's and B's situation than was actually true.

{¶35} On February 10, 2023, the magistrate granted HCJFS's motion and awarded interim custody of all six children to HCJFS. Mother agreed that Sa.C. and Sr.C. would be placed with their father C.W., and S.W. would be placed with his father R.W. HCJFS was ordered to investigate possible placements for the other children, and, as a result, A and B were later placed with their father, M.J., while O.M.C. was placed in a respite home. The magistrate also appointed a guardian ad litem for the children. On March 1, 2023, Mother objected to the magistrate's decision, arguing in part that she did not agree to placement of the children with their fathers.

{¶36} Around this time, HCJFS referred Mother to Dr. Stephen Billman for a psychological evaluation, which she completed on March 21, 2023. Dr. Billman is a psychiatric expert who has conducted approximately 2,000 evaluations over the course of his career. After evaluating Mother, Dr. Billman issued a report to HCJFS regarding the status of her mental health. In it, he described Mother as "pleasant, cooperative, and polite," documenting that she arrived early to the appointment. He further noted that Mother was attending counseling to manage the distress she felt from losing custody of her children. He concluded that Mother did not have a mental-health disorder but instead suffered from an adjustment disorder. He later clarified that an adjustment disorder arises as a response to a stressful situation and is not a

---

[11] East later testified that she had received updated weights for A and B from McHale on February 3rd and 6th—several days before she submitted her affidavit to the court. We do not speculate on the reasons why East would have omitted this critical information. We simply note its absence.

mental-health diagnosis. Dr. Billman additionally opined that Mother's "historical ability to raise her other 5 children, her education, stable employment as an EMT, above average intelligence, obtaining a lactation consultant, being released from PES, all suggest that [Mother] was able to regain reasonable control and care for herself and her children." He further described Mother as "an intelligent, self-assured individual who has been generally successful in her life and in raising her children." Dr. Billman recommended that Mother continue counseling but made no other recommendations.

**{¶37}** On May 10, 2023, Mother appeared in court to argue her pro se emergency-custody motion. She contended that visitation with all six children had been difficult following the magistrate's February 10th interim-custody order because neither HCJFS nor her children's fathers would facilitate it. According to Mother, the prolonged period of separation from her and from each other was causing her children emotional harm.[12] This appeared to be true, because, on May 12, 2023, the guardian ad litem filed a notice indicating that all four older children expressed a desire to return to the custody of Mother, despite the guardian ad litem's recommendation to the contrary.[13]

### B. First Amended Complaint[14]

**{¶38}** On May 30, 2023, HCJFS filed its first amended complaint for temporary custody, again signed by East, which included new, unrelated allegations

---

[12] Although not raised as an issue in this appeal, the record confirms Mother's assertion. With the possible exception of R.W., the fathers of S.W., Sa.C., Sr.C., and O.M.C. have done little to facilitate Mother's relationship with the children following HCJFS's involvement with the family.

[13] The record does not reflect that the juvenile court appointed attorneys for S.W., Sa.C., Sr.C., or O.M.C. under *In re Williams*, 2004-Ohio-1500, despite the clear conflict between the children's expressed wishes and the recommendation of the guardian ad litem. *See* Juv.R. 4(C) (requiring appointed counsel for a child where there is a conflict between the guardian ad litem and the interest or wishes of the child).

[14] This was actually HCJFS's second amended complaint in the initial action. HCJFS amended its initial complaint on February 13, 2023, to add M.J. as the twins' father. For ease of reference, we refer to the May 30, 2023 complaint as the first amended complaint.

as to events that had occurred since February 2023. Among the allegations in the first amended complaint were concerns about Mother's mental health. This was despite the fact that PES had determined Mother was not a safety risk to herself or others and despite Dr. Billman's conclusion that Mother did not suffer from a mental-health disorder.

{¶39} While this complaint was pending, Mother again filed a pro se motion for emergency custody on the basis that she was denied visits with her children. In response, HCJFS contended that the children's fathers, as the custodians, controlled whether visitation occurred for the children except O.M.C. The record reflects that the fathers inconsistently permitted visitation with Mother.

{¶40} On August 21, 2023, HCJFS filed a motion to dismiss its first amended complaint without prejudice. That motion was granted.

### C.    Second Complaint

{¶41} Also, on August 21, 2023, HCJFS refiled its complaint for temporary custody, again seeking to have the children declared abused, neglected, and dependent. The second complaint was identical to the first amended complaint but included additional factual allegations that had occurred after the first amended complaint was filed. HCJFS also filed a motion for interim custody of the children.

{¶42} The juvenile court conducted a day-one hearing on the second complaint on August 22, 2023.[15] At the hearing, East identified HCJFS's consulting nurse practitioner as Julie Dversdall. East testified that she consulted with Dversdall, who had reviewed the babies' CCHMC records but not their ECO clinic records, before

---

[15] Pursuant to Loc.R. 38 of the Hamilton County Juvenile Court, a day-one hearing is the initial hearing in any abuse, neglect, or dependency case. Interim-custody motions are typically considered at a day-one hearing. As best we can tell, the term "day-one hearing" is specific to Hamilton County, as it appears to derive from the juvenile court's local rule.

seeking ex parte emergency custody on February 9, 2023.

**{¶43}** At the conclusion of the hearing, the magistrate granted HCJFS's interim-custody motion. O.M.C. therefore remained in the interim custody of HCJFS, and the other children remained in the interim custody of their respective fathers. The magistrate's order was upheld over Mother's objection.

**{¶44}** On October 25, 2023, a magistrate conducted an adjudication hearing on HCJFS's second complaint. During the testimony of HCJFS's first witness, Mother's attorney indicated that she had received a note from Mother expressing her desire to accept a settlement agreement proposed by HCJFS. In response to questions by the magistrate, Mother stated that she felt threatened by HCJFS and that her only option if she wanted to see her children was to enter into the agreement. Despite Mother's answers, the magistrate accepted the agreement.

**{¶45}** Pursuant to the settlement agreement, the magistrate entered a decision adjudicating O.M.C. dependent, dismissing the complaint as to the remainder of the children, awarding legal custody of the older children to their respective fathers, and continuing the matter for disposition to October 26, 2023.

**{¶46}** At that hearing, Mother moved to revoke her consent to the agreement, arguing that it was brokered under duress, and requested a trial instead. The magistrate offered instead to reset the matter for a pretrial hearing, but Mother refused to waive the time requirements allowing him to do so. She contended that she had been prepared for the adjudication hearing the day before and wanted to proceed. In response, the magistrate accused Mother of "acting like you're the victim." He instructed her to file an objection and proceeded with the dispositional hearing over Mother's objection. At the conclusion of the hearing, the magistrate issued a decision awarding interim custody of O.M.C. to HCJFS and interim legal custody of the

remaining children to their respective fathers.

**{¶47}** On October 30, 2023, Mother filed a motion to set aside the magistrate's order, and on November 1, 2023, she filed objections to the magistrate's decision.[16] The juvenile court agreed with Mother, finding that there was a genuine issue as to the content of the parties' agreement. On January 22, 2024, it remanded the matter to the magistrate for reconsideration and a full evidentiary hearing. But by that time, the timeline to pursue HCJFS's second complaint had expired, and the second complaint was dismissed.

### D.    *Third Complaint*

**{¶48}** On the same day as the juvenile court's order, January 22, 2024, HCJFS filed another complaint for temporary custody and motion for interim custody. As with the second complaint, the third complaint contained identical allegations to the initial complaint with updated factual contentions that allegedly occurred during the intervening time period. By this point, the complaint included allegations pertaining not only to A's and B's weights and Mother's stay at PES, but also to other incidents that occurred between Mother and other parents, between Mother and HCJFS, and between Mother and some of the older children. HCJFS's third complaint sought an adjudication that the children were abused, neglected, and dependent and sought a disposition of temporary custody. But the complaint did not identify which factual allegations supported HCJFS's contention as to the children's status and which factual allegations supported the agency's argument that it was entitled to custody. As a result of these deficiencies, Mother understandably did not appear to know which allegations she should be prepared to defend at the adjudicatory hearing and which allegations

---

[16] Mother also filed a notice of appeal with this court in the appeal numbered C-230611. We dismissed the appeal for lack of a final appealable order.

pertained to the disposition of the children should they be adjudicated as abused, neglected, or dependent.[17]

{¶49} On January 23, 2024, a magistrate conducted a day-one hearing on HCJFS's third complaint. A number of witnesses testified at the proceeding, including East, James, and a different HCJFS supervisor, Sierra Whitlock.

{¶50} During her testimony, East confirmed that she had received updates on the babies' weights and progress from McHale on February 3rd and 6th. East also testified that Mother missed an appointment at the ECO clinic on February 7th, but admitted that her source of that information was a note Bell left in HCJFS's internal system, not any records she had requested from the ECO clinic directly. According to East, HCJFS felt it was a "reasonable compromise" for Mother to be seen by the lactation consultant on February 3rd, 4th, and 6th, but did not believe, based on Dversdall's opinion, that it was reasonable to wait until February 10th for Mother's appointment with McHale or her rescheduled appointment with James. East did not address how the four-day delay between McHale's February 6th visit and Mother's outstanding appointments on February 10th was consistent or inconsistent with the four-day return appointment that CCHMC originally offered on January 31st. East was also permitted to opine that a lactation consultant is not a "medical professional," without offering any basis for that opinion.

{¶51} Mother attempted to solicit information from East as to why HCJFS

---

[17] At the adjudication hearings, evidence presented by HCJFS was admitted over Mother's objection on the basis that it was adjudicatory rather than dispositional, and Mother was precluded from introducing evidence on the basis that it was dispositional rather than adjudicatory. The juvenile court, the attorneys, and the parties spent considerable time arguing back and forth about which evidence pertained to which phase of the case, with no clear answers being advanced by anyone below. Mother does not assign this issue as error on appeal, but we note a lack of clarity, both in the written record and in the transcript, as to which facts HCJFS contends supports its various allegations.

deemed Dversdall's opinion superior to James's, given their identical credentials and given that James had examined the babies, but Dversdall had not, as well as to why Mother's lactation consultant was insufficient. The magistrate sustained HCJFS's objections to these questions, so East never answered them.

{¶52} Sierra Whitlock testified that she served as a supervisor in the Children's Services Division of HCJFS but gave no further information on her background, education, qualifications, or credentials. She indicated that Mother's case had been transferred to her from the previous supervisor, presumably East.[18] Whitlock testified that her communication with Mother had been limited to emails and a brief conversation after a court hearing. Despite this very sparse contact, Whitlock drew broad conclusions about Mother. She opined, under oath, that Mother "has no regard for medical professionals, mental health professionals, the court itself, or the agency as a whole." Whitlock did not address how this statement might have conflicted with other evidence: Dr. Billman's report describing Mother as cooperative and polite and indicating that she arrived early to her psychological evaluation; the fact that Mother welcomed both Bell and McHale into her home; Mother's voluntary visits to Good Sam and CCHMC to have A and B examined by doctors before HCJFS became involved; Mother's independent decision to engage in counseling after HCJFS's intervention; and Mother's request at PES to see a doctor expeditiously so that she could timely attend court.

{¶53} Whitlock further expressed that Mother "acts out in ways that are not safe for her children." The only example she gave of this behavior was that Mother

---

[18] No one ever explained how the Children's Services Division is different in responsibility or organization from the Present Danger Unit or the Assessment Unit or why Mother's case was transferred from the Assessment Unit to the Children's Services Division.

called the suicide hotline. Whitlock admitted that Mother did not have custody of A and B at the time of Mother's hotline call—HCJFS did—and that Mother had made arrangements for her older children to be cared for while she was at the hospital. The only problem Whitlock identified was that HCJFS did not know what Mother's arrangements were.

{¶54} James testified to her involvement with Mother, A, B, McHale, and East. James described Mother's visit with the twins to the ECO clinic on January 31st. When Mother first arrived at the clinic, she was appropriately concerned about the babies but had lost trust in her current healthcare provider and was lacking support. James began by observing the babies breastfeed. From her observation, they latched properly, and Mother's breasts were engorged, indicating that she was producing sufficient breastmilk. But the babies, although healthy in appearance, were underweight. She expected, however, that they would be slower to gain weight, given their status as twins. James suggested a lactation consultant.

{¶55} James communicated with McHale over the following week and learned that A and B were gaining weight. She did not see any basis for hospitalization based on the reports from McHale. Nonetheless, she received a call from East, who demanded that she stop her treatment plan with Mother and convince Mother to hospitalize the twins. James explained that it was inappropriate for an HCJFS caseworker to insist that a provider stop seeing patients. That is when East threatened James with a false report to the court.

{¶56} James scheduled a follow-up appointment with the twins for February 9th, not February 7th, but Mother was late, and James could not fit her in that day. She later learned that the twins had been admitted to CCHMC and that Mother was distraught. She contacted a resident she knew at CCHMC, who informed her that the

twins had been given bottles of formula, had gained weight overnight, and were going to be released the next day. According to James, M.J. brought them back to her in March.

**{¶57}** At the conclusion of the day-one hearing, the magistrate again granted HCJFS's motion for interim custody. HCJFS was awarded interim custody of O.M.C., and interim custody was granted to the fathers of the remaining children.

**{¶58}** Between the filing of HCJFS's initial complaint and its third complaint, three of the children's fathers—C.H., M.J., and P.M.—also filed their own petitions for custody of their respective children. R.W. did not separately petition the court for custody of S.W. Therefore, by time the third complaint was adjudicated, HCJFS and three of the children's fathers sought to remove custody of the children from Mother.

**{¶59}** The adjudication of these petitions and HCJFS's third complaint took place over six days: July 10 through 12, 2024, August 1, 2024, August 5, 2024, and August 19, 2024. The parties entered into various factual stipulations, which largely pertained to events that occurred after February 2023. The only stipulation pertinent to the abuse, neglect, and dependency adjudication stated: "The HCJFS responded to Mother's home on January 31, 2023. The HCJFS requested help from law enforcement to assess the twins. Mother agreed to take the children to be seen by the ECO Health Clinic despite stating she did not think it was necessary."

**{¶60}** Over the course of the six adjudication hearings, Mother, C.H., and M.J. testified, along with East, Jordan, McHale, Dversdall, Dr. Billman, and a number of other civilian and professional witnesses. Notably, Dversdall testified that she had not reviewed the twins' records from the ECO clinic when she recommended that HCJFS seek emergency custody and that a doctor had not reviewed her assessment that the twins required hospitalization. East testified that she did not have any concerns about

22

James's recommendation until she consulted with Dversdall.

**{¶61}** Among other subjects, Mother testified to the impact of HCFJS's involvement on her children and her family. She described the infrequency of her visits with all of her children together since HCJFS initially moved for temporary custody on February 10, 2023. She spoke to her efforts to create a sense of normal family life in the truncated two-hour visits she sporadically enjoys with S.W., Sa.C., Sr.C., and O.M.C.—bringing backdrops to take family photos, special fruits and foods the children enjoy, and gifts and toys for missed birthdays; working through math problems and reading together; and talking about how to effectively navigate complex emotional situations. She presented herself as a parent who deeply loves her children and prioritizes their emotional and developmental needs. Two witnesses from the visitation center who observed these encounters confirmed Mother's description of her parenting time.

### E. Adjudication and Disposition

**{¶62}** On September 9, 2024, the juvenile court issued an order adjudicating A and B neglected and dependent and S.W., Sa.C., Sr.C., and O.M.C. dependent. It declined to find A and B abused because neither child had suffered intentional physical harm. It therefore dismissed the allegation of abuse involving A and B.

**{¶63}** With regard to the neglect allegation, the juvenile court defined the term "neglected child" by reference to R.C. 2151.03(A)(1), (2), and (3). These provisions identify neglect in situations where (1) a child is abandoned or (2) lacks adequate parental care because of the faults or habits of the child's parent or where (3) a parent refuses to provide proper subsistence, education, medical, surgical, or other care necessary for the child's health and well-being.

**{¶64}** In applying these provisions to A and B, the juvenile court expressed its

concern that Mother failed to follow up for several days following the CCHMC visit on January 31, 2023, and further chastised Mother for not doing more after HCJFS informed her that James and McHale were insufficient medical providers.[19] It noted that HCJFS correctly filed for emergency interim custody of A and B on this basis. But the issue with the babies' declining weight was not the basis of its neglect finding. Rather, the juvenile court determined A and B to be neglected solely on the basis of "[Mother's] behavior at the hospital and subsequently being admitted to P.E.S." It declined to find the four older children neglected and dismissed that allegation as to them.

{¶65} With regard to the dependency allegation, the juvenile court relied upon R.C. 2151.04(D), which defines a child as dependent when the child resides in a household where a parent commits an act that is the basis of a neglect adjudication and where the child is in danger of being abused or neglected by that parent. After adjudicating A and B neglected, the court concluded "therefore the older children are found dependent." Its finding of dependency as to the older children was accordingly tethered to its finding of neglect as to the infant twins. The juvenile court also found A and B dependent but never set forth the basis for this determination.

{¶66} Following the juvenile court's adjudication, the court conducted a dispositional hearing on September 11, 2024. After that hearing, the juvenile court

---

[19] Although not directly an issue in this appeal, given the juvenile court's ultimate basis for its neglect finding, we question how Mother's disregard of this information could have amounted to neglect in the context of this case. No evidence was presented below to substantiate the notion that either James or McHale were insufficiently qualified to offer medical advice to Mother within the context of their certifications—family nurse practitioner for James and lactation consultant for McHale—or to support the idea that Mother would have known them to be unqualified. HCJFS cannot simply label a parent's chosen licensed health care professional as insufficient, without further substantiation, and use that unilateral determination as a basis to remove children from their parent's care. *See, e.g., In re C.O.*, 2013-Ohio-5239, ¶ 34 (8th Dist.) (upholding trial court's dismissal of neglect complaint where father was providing a form of mental-health care for his children although not the exact form of care recommended by Children's Hospital).

awarded temporary custody of O.M.C. to HCJFS. As a disposition for the neglect and dependency adjudications, the juvenile court awarded legal custody of the other children to their respective fathers. As to visitation, Mother was granted in-home facilitated visits with O.M.C., alternating weekly parenting time with S.W., Sa.C., and Sr.C., and supervised visits with A and B twice a week. The separate custody petitions filed by C.H., P.M., and M.J. were dismissed.

{¶67} Mother now appeals.

### *Analysis*

{¶68} Before addressing Mother's assignments of error, we begin with an explanation of the status of this appeal.

{¶69} Mother initiated this proceeding without counsel. In her docketing statement, filed at the same time as her notice of appeal, she indicated her intent to challenge whether the juvenile court's September 9, 2024 adjudication was supported by clear and convincing evidence. Mother later retained an attorney to represent her on appeal. But the initial brief he filed on her behalf did not pursue that issue. Instead, it solely argued that the juvenile court's initial day-one hearing, conducted on February 10, 2023, was procedurally and constitutionally improper. In that regard, Mother's initial brief advanced a single assignment of error: "The juvenile court erred when upon its initial ex parte and day one hearing made [sic] a finding to remove the children from appellant Mother's custody without showing imminent risk of harm to all her children thus lacking probable cause and amounts [sic] to an abuse of discretion of the court and further violated Mother's due process under the United States Constitution."

{¶70} Several appellees pointed out in their initial response briefs that this argument was moot, as HCJFS had dismissed its initial complaint, and the juvenile

court had adjudicated its third, not its first, complaint. We agree with this contention. While we have concerns about the manner in which the children were removed from Mother's custody, any procedural or constitutional errors that may have occurred at the initial day-one hearing were rendered moot when HCJFS dismissed its first complaint. *See, e.g., Huntington Natl. Bank v. CPW Properties*, 2018-Ohio-1219, ¶ 4-5 (7th Dist.) (finding appeal moot because underlying action was voluntarily dismissed). We accordingly overrule the assignment of error raised in Mother's initial brief.

{¶71} But that does not end the inquiry. Several appellees appeared to argue in their initial response briefs that the juvenile court's adjudication was proper. And Mother clearly indicated in her initiating documents that she wanted the court to address that issue—whether clear and convincing evidence supported finding A and B neglected and all six children dependent. Yet no brief submitted by any party correctly explained the applicable standard that applies at this stage of a neglect-and-dependency case, so we ordered supplemental briefing to sort this all out. In specific, we ordered the parties to address whether the adjudication below was supported by clear and convincing evidence.

{¶72} In her supplemental brief, Mother raised a second assignment of error: "The juvenile court erred in adjudicating the minor children were neglected [sic] or dependent where the court's finding was based upon conflicting testimony that could not establish clear and convincing evidence sufficient to create a firm belief or conviction that the children were neglected or dependent." And the appellees responded, more or less, to this assertion in their supplemental briefs as well.

{¶73} Nevertheless, despite being given a second opportunity to correctly frame the issues in this case, the parties' supplemental briefs still reflect a fundamental

misunderstanding of the applicable law. For example, both Mother's and the guardian ad litem's briefs reflect confusion as to the scope of our review. As we explain below, the clear-and-convincing-evidence standard, not the sufficient-evidence standard, applies to abuse, neglect, and dependency adjudications. In addition, C.H.'s brief incorrectly argues that Mother must challenge the juvenile court's disposition in order to challenge its adjudication. This argument lacks formal logic. In a temporary custody case, such as this one, a trial court determines whether a child is abused, neglected, or dependent in the beginning stage of the case, called the adjudication. *In re E.C.*, 2019-Ohio-3791, ¶ 17 (10th Dist.). The case then proceeds to disposition if there is an adjudication. *Id.* Because an adjudication is the lynchpin of a disposition, a parent may challenge the propriety of an adjudication without attacking a disposition.

{¶74} HCJFS's brief comes closer, but blends adjudicatory facts with dispositional ones, highlighting our concern that its complaint provided insufficient notice as to which allegations Mother should be prepared to defend at the various stages of the case.[20] Both R.W.'s and the guardian ad litem's briefs make the same mistake. We appreciate the efforts of counsel to represent parents and guardians in temporary custody proceedings. But the seriousness of these appeals and their lasting impact on children's lives demand greater precision than we found in the parties' briefs.

{¶75} We provide that attention now. Turning to Mother's supplemental, or

---

[20] For example, as part of its analysis of whether clear and convincing evidence supported the adjudication of A and B as neglected, HCJFS's brief cites an incident in which Mother supposedly placed an AirTag in one of the older children's socks. This event allegedly occurred well after HCJFS and the fathers obtained interim custody of the children. It is unclear, given this timeline, how this allegation could have supported the juvenile court's adjudication and therefore unclear why HCJFS relies on it.

second, assignment of error, we first address the standard of review. Where a juvenile court adjudicates a child abused, neglected, or dependent, the finding must be supported by clear and convincing evidence. *In re R.S.*, 2023-Ohio-3323, ¶ 6 (1st Dist.) (citing R.C. 2151.353(A)). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re L.K.*, 2025-Ohio-5331, ¶ 16 (1st Dist.).

### A. *Neglect*

**{¶76}** The juvenile court adjudicated A and B neglected based on "Mother's behavior at the hospital and subsequently being admitted to PES." R.C. 2151.03(A) defines a "neglected" child as a child (1) who is abandoned; (2) who lacks adequate parental care due to the parent's faults or habits; (3) whose parent refuses to provide subsistence, education, or medical treatment; (4) whose parent refuses to provide special care to them due to their mental condition; (5) whose parent has placed or attempted to place them in violation of law; (6) who suffers physical or mental injury that harms the child's health or welfare because of the parent's omission; or (7) who is subjected to out-of-home child care neglect.

**{¶77}** The juvenile court did not specify which provision it believed applied to A's and B's circumstances, although it only cited subsections (A)(1), (A)(2), and (A)(3) in defining the term "neglected child." That alone is problematic, as there are different definitions that apply to each subsection of the statute, and the juvenile court gave no indication of which grounded its opinion. *See, e.g., In re L.K.* at ¶ 20, 28 (explaining the varying legal standards that apply to the (A)(2) and (A)(6) subsections). But this lack of specificity is not dispositive to our analysis, because the evidence presented at the adjudication hearing did not support the juvenile court's neglect adjudication for A and B under any of the subsections of R.C. 2151.03(A) that the court cited below.

28

{¶78} As to abandonment under R.C. 2151.03(A)(1), Mother did not abandon A and B for the short period of time that she called the suicide hotline and was evaluated at PES. While there is scant case law on what abandonment means in this context, a child is presumed abandoned under R.C. 2151.011(C) when a parent has failed to visit or maintain contact for more than 90 days. Mother, in contrast, was gone for a matter of hours—and not by her choosing. She was arrested by police and brought to PES until she was released after being determined not to present any safety risk. Upon her release, she immediately sought to determine the babies' status by calling CCHMC, signaling her desire to provide care for them. Given the short duration of Mother's separation from her children, the record lacks clear and convincing evidence that Mother abandoned A and B.

{¶79} Nor did A and B lack adequate parental care due to Mother's faults or habits under R.C. 2151.03(A)(2). Pursuant to R.C. 2151.011(B)(1), a child receives "adequate parental care" when they have "adequate food, clothing, and shelter to ensure [their] health and physical safety. . . ." At the time of Mother's suicide hotline call and subsequent evaluation at PES, A and B were in the emergency custody of HCJFS and were hospitalized at CCHMC. During their brief stay there, which spanned a matter of hours, the babies received a bottle of formula, gained weight, and were discharged. We can imagine no safer place for children, where their immediate physical needs will undoubtedly be met, than at a hospital in HCJFS's custody. This is, quite simply, the antithesis of neglect.

{¶80} The (A)(3) subsection is similarly inapplicable to Mother's actions. That provision applies when a parent refuses to provide subsistence, education, or medical treatment to a child. But Mother did nothing of the sort. To the contrary, the record reflects that Mother provided, rather than refused, subsistence and medical care for A

and B when they were hospitalized at CCHMC. Before she was transported to PES, she breastfed them at the hospital, and after she was arrested, she asked for a breast pump to continue supplying milk for them. The babies remained hospitalized at CCHMC during Mother's evaluation at PES, during which time they received medical care. On these facts, we fail to see how Mother neglected her children.

{¶81} In reaching this conclusion, we are motivated by our opinions in *In re L.K.*, 2025-Ohio-5331 (1st Dist.), and *In re R.S.*, 2023-Ohio-3323 (1st Dist.). In *In re L.K.*, we reversed a finding of neglect under R.C. 2151.03(A)(2) and (A)(6) where a mother made disparaging comments to her nine-year-old son, threw his vitamins on the floor, reported to HCJFS that she was suicidal and needed help, and left him home alone for an undetermined period of time. *L.K.* at ¶ 24-25, 29-30. With regard to the (A)(2) subsection, we held that these facts, while negatively impacting the son, did not establish that he lacked adequate parental care. *Id.* at ¶ 25. With regard to the (A)(6) subsection, we held that the mother took affirmative action, rather than omission, by leaving the house without her child, thus falling short of the statute's requirements. *Id.* at ¶ 29. But, even if that action could be characterized as an omission, we also noted the absence of physical or mental injury to the son, an essential requirement under subsection (A)(6). *Id.* at ¶ 38. We accordingly reversed the juvenile court's neglect finding. *Id.* at ¶ 45.

{¶82} Unlike *In re L.K.*, *In re R.S.* is a dependency, not a neglect, case. But it animates our understanding of Mother's situation, because it explains that a parent who seeks help for a mental-health crisis, while leaving a child in the care of a responsible adult, protects rather than harms the child. *In re R.S.* at ¶ 15. In *In re R.S.*, a mother was admitted to the hospital after admitting that she had been awake for three straight days and was suicidal. *Id.* at ¶ 2. The mother also tested positive for

opiates on admission, but with a negative range at the time, indicating that she had used illicit drugs at some point in the past. *Id.* The mother left her seven-year-old daughter with her grandmother before reporting to the hospital. *Id.* On this basis, the juvenile court adjudicated the daughter dependent. *Id.* at ¶ 4. But we reversed, finding no evidence that the daughter was not receiving proper or adequate care. *Id.* at ¶ 15. To the contrary, "when she began to break down, mother secured care for her daughter" before seeking help for herself, indicating that she was willing and able to protect her child. *Id.*

{¶83} We see this case in a similar vein. After Mother lost custody of A and B and learned of HCJFS's intention to remove her older children from her care, she was understandably distraught.[21] She acted responsibly in seeking assistance from the suicide hotline while her babies were safely in the care of HCJFS and CCHMC. The fact that Mother returned to her car for feeding supplies after making the hotline call but did not retrieve her gun from the glovebox is indicative of Mother's ability to prioritize her children's needs over her own emotional distress. On the record before us, no clear and convincing evidence supports the juvenile court's finding that Mother neglected A and B based on her "behavior at the hospital and subsequently being admitted to PES." We accordingly sustain Mother's second assignment of error in relevant part and reverse the judgment of the juvenile court's finding of neglect.

### B. Dependency

{¶84} The juvenile court adjudicated the four older children—S.W., Sa.C., Sr.C., and O.M.C.—to be dependent pursuant to R.C. 2151.04(D). That statute labels children dependent if they reside in a household in which a parent committed an act

---

[21] In fact, her distress at the thought of losing her children could speak to her desire to protect and care for them, not the other way around, as HCJFS claimed below.

that is the basis of a neglect finding and if they are in danger of being abused or neglected by the parent. To support its conclusion that the older children were dependent under this provision, the juvenile court found that the older children were at risk because they were not in Mother's care when she took the twins to CCHMC and found that A and B were neglected. It made no other findings in this regard.

{¶85} Because the juvenile court's dependency finding as to the older children was dependent upon the adjudication of A and B as neglected, our reversal of that adjudication necessarily undermines the adjudication of S.W., Sa.C., Sr.C., and O.M.C. as dependent. We accordingly sustain Mother's second assignment of error as to the dependency adjudication of the four older children and reverse the juvenile court's judgment in that regard.

{¶86} In addition, the juvenile court further found A and B to be dependent without conducting any analysis or explaining any basis for its ruling. We do not speculate as to the basis for its judgment. But in the absence of any findings supporting a dependency adjudication below, we find no clear and convincing evidence in favor of finding A and B to be dependent. We according sustain this portion of Mother's second assignment of error and reverse that aspect of the juvenile court's judgment as well.

{¶87} Mother's second assignment of error is therefore sustained as to the adjudication of A and B as neglected and as to the adjudication of all six children as dependent. Because we reverse the juvenile court's adjudication, we also reverse its dispositional orders, as disposition inherently follows adjudication. We accordingly decline to address Mother's second assignment of error as it pertains to the juvenile court's disposition; that argument is now moot.

### *Conclusion*

**{¶88}** This appeal raises serious questions about whether and when HCJFS should intervene when a parent pursues a second medical opinion that differs from the advice offered by CCHMC. We need not answer those questions head-on, because the clear and convincing evidence in this case demonstrates that Mother did not neglect her babies by calling a suicide hotline for help when the babies were safely hospitalized in HCJFS's custody. Nor did she neglect them when police arrested her for a psychological evaluation that lasted far less than a day.

**{¶89}** Nonetheless, we remain concerned about the deterrent effect that cases like this one might have on parents' willingness to seek help when facing mental-health crises. Parents staring down suicidal thoughts should not be forced to choose between making a life-saving phone call and losing custody of their children. It is particularly troubling that the parents faced with that exact dilemma in *In re L.K.*, *In re R.S.*, and this case were all mothers. We credit, rather than condemn, Mother for seeking support at the time she needed it most, and we encourage HCJFS to see efforts like hers in a more positive and affirming light in the future.

**{¶90}** For the foregoing reasons, HCJFS failed to prove by clear and convincing evidence that the twins were neglected and that all six children were dependent. Therefore, we sustain Mother's second assignment of error in part and reverse the judgment of the juvenile court adjudicating A and B neglected, adjudicating A, B, S.W., Sa.C., Sr.C., and O.M.C. dependent, awarding temporary custody of O.M.C. to HCJFS, and awarding legal custody of the remaining children to their respective fathers. We do not address the remainder of Mother's second assignment of error because it is moot. We remand the cause to the juvenile court for further proceedings consistent with the law and this opinion.

Judgment reversed and cause remanded.

**CROUSE** and **NESTOR, JJ.,** concur.